# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**     **MISSISSIPPI CENTER FOR**
              **ADVANCED MEDICINE, P.C.**                    **CHAPTER 11**
              **Debtor**                              **CASE NO. 23-00962-JAW**

## EMERGENCY MOTION FOR USE OF CASH COLLATERAL

COMES NOW Mississippi Center for Advanced Medicine, P.C. (the "Debtor" or "MCAM")

and files this its *Emergency Motion for Use of Cash Collateral* (the "Motion"), and in support

thereof would respectfully show as follows, to-wit:

1.     On April 21, 2023, the Debtor herein filed with this Court its Voluntary Petition (the

"Petition") for bankruptcy under Chapter 11 of the Bankruptcy Code (the "Petition Date").

2.     Subsequent thereto, the Debtor has been, and is, the duly qualified, and acting,

Debtor-in-possession.  The Debtor continues to operate its businesses and manage its properties as

debtor-in-possession.

### JURISDICTION

3.     This Honorable Court has jurisdiction of the subject matter herein and the parties

hereto pursuant to 28 U.S.C. §§ 157 and 1334.  This Motion is a "core proceeding" which has the

meaning of 28 U.S.C. § 157.

### GENERAL BACKGROUND

4.     The Debtor was founded on July 1, 2016, by Dr. Spencer Sullivan ("Dr. Sullivan"),

a Pediatric Hematologist and sole owner of the professional corporation.  The Debtor's goal was to

create another option for pediatric specialty care in Mississippi while improving the quality of

pediatric care in the state.

5.     Jordan Robinson is the Vice President and Chief Operating Officer of the Debtor, and

provides operational, service line strategic management, strategic planning, and analytical support

for the Debtor.

6.  The Debtor currently employs 18 pediatric related specialty positions along with four additional pediatric providers encompassing 16 medical specialties, including but not limited to:

- Pediatric Allergy, Asthma, and Immunology (also serving adults for the full spectrum of care)
- Pediatric Audiology
- Pediatric Cardiology
- Pediatric Chronic Pain
- Pediatric Dietary and Nutrition
- Pediatric Endocrinology
- Pediatric Hematology (also serves adults with bleeding disorders and sickle cell disease)
- Pediatric Hospital Medicine (MCAM provides inpatient pediatric care at Mississippi Baptist Medical Center in Jackson and Baptist Memorial Hospital - North Mississippi in Oxford, two of Mississippi's highest performing hospitals
- Pediatric Mental Health Therapy
- Pediatric Metabolic Medicine (healthy weight for children)
- Pediatric Plastic Surgery (also serves adults for certain conditions)
- Pediatric Pulmonology
- Pediatric Rheumatology
- Pediatric Speech and Language Pathology
- Pediatric Urgent Care
- Maternal Fetal Medicine (high risk obstetrics)

7.  All of the physicians and providers employed by the Debtor treat pediatric patients regardless of ability to pay, including children on Medicaid, CHIP (Children's Health Insurance Program), commercial insurance, TriCare and uninsured patients.

8.  The Debtor's operating budget for the 2023 fiscal year is approximately $60,000,000 and encompases about 100 employees.

9.  The Debtor's primary (specialty care) facilities and offices are located at 401 Baptist Drive, Suite 301, in Madison, MS, and 7330 Old Canton Road, Buildings A & B, in Madison, MS. In December, 2022, the Debtor opened a new urgent care location under the name Pediatric Urgent Care, located at 1200 North State Street, Suite 180, in Jackson, MS.

10.    The Debtor also has a northern Mississippi satellite office located at 330 West Jefferson Street in Tupelo, MS, and a Louisiana Center for Advanced Medicine located at 2053 Gause Blvd East, Suite 200, Slidell, LA.

11.    Additionally, the Debtor sends its employed physicians and providers to certain outreach locations in Mississippi where patients may be seen by a specialist closer to home. These outreach locations include Columbus, Hattiesburg, McComb, Oxford, Ruleville and Southaven.

12.    By working across the state in so many locations, the Debtor strives to provide a medical home concept for children with chronic conditions. In addition to the pediatric specialists, there are social workers, clinical pharmacists and other dedicated clinical personnel including, but not limited to, nurses, medical assistants, laboratory specialists and sonographers that work in unison to provide the right care at the right time at the right place.

13.    The Debtor's social workers help address patient families social determinants of health and often help patients with Medicaid enrollment, transportation issues and with a variety of other concerns.

14.    The Debtor also maintains a pediatric clinical pharmacy which provides and manages both retail and specialty medications. Specialty medications are drugs that are used to treat complex and chronic diseases. These drugs require special storage, handling, and administration, necessitate extensive patient education, and require greater clinical support to maximize patient outcomes. In addition to medical providers, the Debtor's clinical pharmacists see patients on specialty medications when they visit the center. The Debtor's clinical pharmacists and providers collaborate together to add significant value to patient care both during and outside of regular office visits. Integrating medical and pharmaceutical services provides safe, timely, and quality care to patients and their families.

15.     In addition to clinical care, the Debtor also has a research department conducting clinical research, including Phase I-IV industry-sponsored clinical trials and federally funded projects.

16.     The Debtor also hosts students from a variety of disciplines and is about to welcome its second Pediatric Audiology resident. Other educational professions rotating through the Debtor's facilities have included high school and college students interested in the medical field, medical students, nursing students, audiology students, physician assistant and nurse practitioner students.

17.     Clinicians and providers for the Debtor have also adopted the "Comfort Promise", which is an international practice to help prevent and minimize pain, discomfort, and fear of needle and other procedures, especially in children.

18.     For the calendar year 2022, subspecialists for the Debtor received approximately 8,720 referrals from pediatricians, family physicians, nurse practitioners, physician assistants and other providers across Mississippi and beyond.  The Debtor's clinicians completed approximately 21,553 patient visits in 2022 and are on pace for approximately 26,876 patient visits for 2023. There is a high demand for pediatric specialty services in the state of Mississippi and that additional clinicians are needed in a variety of areas to meet the demand.

19.     The Debtor is in the process of adding additional resources to its staff in September of 2023 including a Pediatric Allergist, and also a Child Psychiatrist who is slated to join Pediatric Mental Health department in September.

## PRE-PETITION LITIGATION BACKGROUND

20.     Over a year after MCAM opened its doors, University of Mississippi Medical Center ("UMMC") filed a lawsuit on July 14, 2017, in the Circuit Court of Hinds County, Mississippi, Cause No. 17-410, against MCAM, Dr. Sullivan, and Dr. Nina Washington ("Dr. Washington") who was an employee of MCAM that MCAM recruited from UMMC.  Nearly two years later - and

almost three years after MCAM began - UMMC filed a second lawsuit on June 28, 2019, in the United States District Court for the Southern District of Mississippi, Case No. 3:19-cv-459, against MCAM and Dr. Sullivan, along with former UMMC employees Linnea McMillan, Sue Stevens, and Rachel Henderson Harris.  Years later, these lawsuits remain pending and MCAM continues to vigorously defend itself.

21.     The claims in the two lawsuits largely overlap and center around UMMC's allegation that Dr. Sullivan, for various reasons, did not open MCAM properly and that he and Dr. Washington were contractually prohibited from practicing medicine near UMMC after leaving there.  Since the filing of the federal action, the litigation has focused on UMMC's federal trademark claims and a spreadsheet identifying 168 hemophilia patients (the "Patient List") who received care at UMMC. UMMC contends that this Patient List was a trade secret and that it was improperly taken so MCAM could use it to solicit these patients to transfer their clinical care and pharmacy orders from UMMC to MCAM after Dr. Sullivan left.

22.     Although MCAM denies that the Patient List is a trade secret and maintains that Dr. Sullivan had the right and need to use patient information for purposes of patient care and guaranteeing a smooth transition for patients once he left UMMC, the federal court has ruled that UMMC has prevailed on the question of trade secret liability.  Despite MCAM's defenses to UMMC's claims that taking a copy of the Patient List was improper, a default judgment has been entered against MCAM and the individual defendants in UMMC's federal lawsuit due to instances of discovery misconduct.  Nurses McMillan and Stevens and former MCAM employee Nurse Henderson were untruthful in depositions in the state court lawsuit when asked if a copy of the Patient List was taken from UMMC to MCAM.  Separately, Dr. Sullivan was untruthful in his deposition when he denied possessing an external hard drive and thumb drive that contained emails

from Dr. Sullivan's time at UMMC, as well as sensitive and private information that would have caused unnecessary embarrassment if produced.

23.    Dr. Sullivan attested to the fact that no one at MCAM had anything to do with, or any knowledge of, his withholding the external drives. Similarly, Stevens and McMillan stated that no one requested or authorized their conduct. Nonetheless, the federal court imposed a default judgment on MCAM, Dr. Sullivan, Nurse McMillan, and Nurse Stevens. UMMC earlier dismissed its claims against Nurse Henderson. A damages-only jury trial is set to begin on October 30, 2023, regarding the amount that MCAM and the other remaining defendants in the federal case were unjustly enriched as a result of misappropriating UMMC's trade secrets (primarily, the Patient List).

24.    In the federal litigation, UMMC is not seeking *any* lost profits. UMMC's damages claim is based solely on an unjust-enrichment theory claiming that MCAM should be disgorged from any profits related to pharmacy charges for the patients on the Patient List even if UMMC did not lose any profits as a result. UMMC seeks to disgorge MCAM of all of these profits since opening nearly six years ago, in the amount of close to $30 million. In addition, UMMC seeks punitive damages against MCAM in an amount that could total close to $90 million, plus UMMC's attorneys' fees. UMMC's damages theory posits that it should receive, in perpetuity, MCAM's pharmacy profits flowing from the hemophilia patients who continued their care with Dr. Sullivan at MCAM.

25.    MCAM has retained an expert witness who believes that UMMC's potential damages are significantly lower than what UMMC contends. MCAM's expert will likely testify that UMMC's unjust enrichment damages are minimal, if any. However, even working from the analysis of MCAM's damages expert, depending on how a jury approaches the calculation of damages and how long they conclude the damages period is, it is possible that UMMC's damages exceed MCAM's ability to pay.

26.     UMMC seeks to disgorge multi-million dollars of MCAM's pharmacy-related profits even though MCAM's clinic-wide operations resulted in modest profits in some years and modest losses in other years.  Despite this modest financial performance, MCAM considers itself to be a successful enterprise because of its ever-growing ability to service numerous pediatric subspecialties in a state that perennially receives low marks for the quality of pediatric healthcare services.

## CASH COLLATERAL BACKGROUND

27.     As of the Petition Date, the Debtor was originally in possession and/or in control of cash and since the Petition Date has continued business operations that generate cash and have reduced and continue to reduce various assets of the bankruptcy estate to cash including, without limitation, inventory and accounts receivable collections (collectively, the "Cash Collateral").

28.     BankPlus (the "Bank") is the Debtor's principal secured lender and it asserts various interests in some of the Debtor's personal property including, without limitation, Debtor's accounts receivable (the "Collateral").   Further, the Bank asserts interests in Cash Collateral including, without limitation, that such cash constitutes proceeds of the Collateral and, therefore, constitutes cash collateral within the meaning of Code § 363(a).  The Bank has not agreed to the Motion, but negotiations with the Bank are continuing.

29.     By this Motion, the Debtor seeks to use property that constitutes Cash Collateral pursuant to Code § 363.

30.     Debtor asserts that an immediate need exists for the Debtor to use Cash Collateral in order to continue essential operations, acquire goods and services, and pay other necessary and essential business expenses. Debtor further alleges that the failure of the Debtor's ability to use such Cash Collateral would immediately and irreparably harm the Debtor, its bankruptcy estate and its creditors.

31.     In the ordinary course of the Debtor's business operations, the Debtor maintains certain bank accounts (collectively, the "Bank Accounts") with the Bank, which provide established

mechanisms for the collection, management, and disbursement of funds used in the Debtor's operations (the "Cash Management System").

32.     Good cause exists for the immediate granting of this Motion. Among other things, granting the Motion: (i) will enable the Debtor to continue the operation of its businesses and avoid immediate and irreparable harm to the Debtor's estate; (ii) will permit the Debtor to acquire essential goods and services, and pay other necessary and ordinary business expenses; and (iii) is in the best interests of the Debtor, its creditors, and its bankruptcy estate.

## CASH COLLATERAL REQUEST AND BUDGET

33.     Accordingly, the Debtor moves the Court, on an interim basis, and pending entry of a final order, for an order authorizing it, pursuant to Code §§ 105(a) and 363(c)(1), to continue to manage collection and disbursement of its cash utilizing its Cash Management System in the ordinary course of business consistent with its pre-petition practices, and also to collect and disburse cash in accordance with the Cash Management System.

34.     The Debtor proposes to continue its Cash Management System with the Bank.

35.     Further, the Debtor moves the Court for an order granting the use of Cash Collateral on a temporary basis for the expenses listed in the budget attached hereto as **Exhibit "A"** (the "Budget") for the time period from April 22, 2023, through May 5, 2023 (the "Interim Period") (and for such other extensions as may be agreed to or ordered by the Court by further order), unless specifically prohibited by an order of this Court.

36.     Debtor has agreed to condition the interim use of Cash Collateral upon the following terms:

      a.    <u>Budget</u>. Without prior approval of the Court or the express written consent of the Bank, the Debtor is authorized to pay the reasonable amounts which are the actual, ordinary and necessary expenses in the operation of its business not to exceed one hundred and ten percent (110%) of the amount

stated for each category of expenses in the Budget during the Interim Period; provided, however, that in no event should Cash Collateral during the Interim Period be used to pay pre-petition claims or obligations, other secured claims, or obligations to insiders unless specifically authorized by any order granting this Motion or separate order from this Court. Except as set forth herein, the Debtor shall pay all budgeted expenses when due, including insurance and taxes, and shall notify the Bank of any failure or inability to do so.

b.   Replacement Liens. Effective as of the Petition Date, the Bank is hereby granted replacement security interests in, and liens on, all post-Petition Date acquired property of the Debtor and the Debtor's bankruptcy estates that is the same type of property that the Bank holds a pre-petition interest, lien or security interest to the extent of the validity and priority of such interests, liens, or security interests, if any (the "Replacement Liens"). The amount of each of the Replacement Liens shall be up to the amount of any diminution in value of the Bank's collateral position from the Petition Date. The priority of the Replacement Liens shall be in the same priority as the Bank's pre-petition interests, liens and security interests in similar property.

c.   Automatic Perfection. Any Replacement Lien granted hereunder shall be effective and perfected upon the date of entry of the interim order granting this Motion without necessity for the execution or recordation of filings of deeds of trust, mortgages, security agreements, control agreements, pledge agreements, financing statements or similar documents, or the possession or control by the Bank of, or over, any property subject to the Replacement Liens. The Bank is hereby authorized, but not required, to file or record financing statements or similar instruments in any jurisdiction in order to

validate and perfect the Replacement Liens. Any error or omission in such documents shall in no way affect the validity, perfection or priority of the Replacement Liens. If the Bank files a financing statement or similar instrument pursuant to the terms of this subparagraph and it is later determined by court order or judgment that the Bank is not entitled to a Replacement Lien, then the Bank shall file a termination statement of such financing statement or similar instrument within fourteen (14) days of such order or judgment becoming final and non-appealable.

d.  <u>Lien Challenges</u>. Nothing in the order granting this Motion shall prohibit any party from challenging the amount of the Bank's claims or the nature, extent, validity and priority of the Bank's security interests in, and liens on, Cash Collateral and the Collateral. Further, nothing in the order granting this Motion shall prohibit the Debtor from asserting that its cash does not constitute Cash Collateral. All such rights are expressly preserved. The Debtor and the Bank anticipate that they may disagree upon the proper manner of calculating or ascertaining the diminution of the value of the Bank's collateral position. The Debtor and the Bank have agreed to keep the manner of calculating or ascertaining the diminution in value of the Bank's collateral an open question and nothing in this Motion waives, restricts, or prejudices the ability of any otherwise appropriate party to raise issues regarding diminution of value should such be asserted by the Bank for purposes of asserting a Replacement Lien.

e.  <u>Additional Adequate Protection</u>. The adequate protection requested in this Motion is without prejudice to the Bank seeking further and other adequate protection to the extent it deems the same necessary and appropriate. Further,

this Motion is without prejudice to (i) the Bank seeking the early termination of the Debtor's use of Cash Collateral prior to the expiration of the deadlines contained in this Motion for cause, including lack of adequate protection; (ii) the Debtor opposing such early termination; or (iii) the Bank objecting to the further interim or final use of Cash Collateral.

f.   <u>Insurance</u>.  The Debtor shall continue to maintain adequate and sufficient insurance on all its property and assets.

g.   <u>Inspection and Access to Information</u>.  The Debtor shall cooperate with the Bank with respect to such inspections desired in the ordinary course of business activities during business hours. Further, going forward, the Bank and its professionals shall have the right at all reasonable times to audit, examine, and inspect the Bank's Collateral wherever located, along with any books and records related to the Bank's Collateral, Debtor's business operations, or the business operations of Debtor, so long as these activities do not unreasonably interfere with, or delay, Debtor's ordinary course of business operations during normal business hours and normal business activities. The Bank shall provide Debtor with twenty-four (24) hours' notice prior to any examination or inspection.  Such inspection rights shall continue notwithstanding the expiration of the order granting this Motion.

37.   Debtor agrees that the provisions of any order granting the Motion and any adequate protection granted thereby, including Replacement Liens, shall also extend to any cash used by the Debtor subsequent to the Petition Date, but prior to entry of any order granting the Motion. However, nothing in the order granting this Motion will be mean to ratify or authorize on a *nunc pro tunc* basis any unauthorized payments on pre-petition claims and such payments remain subject to recovery by the bankruptcy estates under applicable bankruptcy law including, without limitation,

pursuant to Code §§ 549 and 550. Similarly, nothing in the order granting this Motion will authorize the payment of pre-petition claims and the payment of any pre-petition claims shall be separate order. The order granting this Motion will be without prejudice to any request made by the Debtor to authorize the payment of pre-petition claims.

38.     Debtor proposes that any order granting the Motion shall be binding upon and inure to the benefit of the Bank, the Debtor, and their respective successors and assigns (including without limitation, any Chapter 11 or Chapter 7 trustee, examiner, or other fiduciary hereafter appointed for the Debtor or with respect to any of the Debtor's property).

39.     Debtor further proposes that any interim order granting the Motion shall become effective and enforceable upon approval and entry as an order of the Bankruptcy Court. If any provision of any such interim order is thereafter modified, vacated or stayed by subsequent order of this or any other court for any reason, such modification, vacation, or stay shall not affect the validity of any obligation or liability incurred pursuant to any such interim order and prior to the later of (a) the effective date of such modification, vacation, or stay, or (b) the entry of the order pursuant to which such modification, vacation, or stay was established. The liens and claims granted to the Bank under any such interim order, and the priority thereof, shall be binding (subject to the terms of any such interim order) on the Debtor, its bankruptcy estate, any subsequent trustee or examiner, and all creditors of the Debtor.

40.     Debtor proposes that a final hearing on the Motion shall be set and scheduled in the interim order granting the Motion.

41.     In the event the Court sees fit to grant the Motion, within two (2) business days after the entry of any interim order, the Debtor shall serve copies of a notice of the entry of the interim order on all parties to whom service must be effected under the Code, Bankruptcy Rules or the Local Rules of the Southern District of Mississippi. Such notice shall state the deadline to file objections to the relief being sought in the Motion and to the Debtor's use of Cash Collateral and that such

objections shall be in writing and shall be filed with the United States Bankruptcy Clerk for the Southern District of Mississippi. Any objections by creditors or other parties-in-interest to the Motion shall be deemed waived unless filed and served in accordance with this paragraph. Any party who has filed an objection, but fails to appear at the hearing shall be deemed to have withdrawn its objection.

42.     Other grounds to be assigned upon a hearing hereof if necessary.

WHEREFORE, PREMISES CONSIDERED, Debtors respectfully pray that upon a hearing hereof this Honorable Court will enter its order granting the Motion. Debtors pray for general relief.

THIS, the ____24th____ day of April, 2023.

Respectfully submitted,

MISSISSIPPI    CENTER    FOR    ADVANCED MEDICINE, P.C.

By Its Attorneys,

LAW OFFICES OF CRAIG M. GENO, PLLC

By: _____
        Craig M. Geno

OF COUNSEL:

Craig M. Geno; MSB No. 4793
LAW OFFICES OF CRAIG M. GENO, PLLC
587 Highland Colony Parkway
Ridgeland, MS 39157
601-427-0048 - Telephone
601-427-0050 - Facsimile
cmgeno@cmgenolaw.com

N:\Firm Data\Users\Bankrupt\MS Center for Advanced Medicine\Pleadings\Revised Em Mot to Use CC 4-24-23.wpd

## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via electronic filing transmission, a true and correct copy of the above and foregoing to the following:

Christopher J. Steiskal, Esq.
Office of United States Trustee
christopher.j.steiskal@usdoj.gov

THIS, the 24th day of April, 2023.

_____
Craig M. Geno

**Two-Week Budget**
**Period of April 22, 2023 thru May 5, 2023**

|  | Amount | Basis | Period Covered |
|---|---:|---|---|
| **Total Income** | **2,631,332** | Last 3 month average | 2 Weeks |
|  |  |  |  |
| Cost of Goods Sold |  |  |  |
| 7000 Pharmacy Shipping | 2,456 | Last 3 month average | 2 Weeks |
| 7005 Drug Supplies-Medical | 649,682 | Last 3 month average | 2 Weeks |
| 7015 Drug Supplies-Pharmacy | 1,017,842 | Last 3 month average | 2 Weeks |
| Total Cost of Goods Sold | 1,669,980 |  |  |
|  |  |  |  |
| **Gross Profit** | **961,352** |  |  |
|  |  |  |  |
| **Expenses** |  |  |  |
| 6000 Bank Charges - Credit Card Processing | 800 | Last 7 month average | 2 Weeks |
| 6001 Bank Charges - Other | 51 | Last 7 month average | 2 Weeks |
| 6008 Charitable Contributions | - | Estimated to be zero | 2 Weeks |
| 6010 Computer Equipment Expense | - | Estimated to be zero | 2 Weeks |
| 6011 Conferences & Seminars | 963 | Last 7 month average | 2 Weeks |
| 6012 Dues & subscriptions | 771 | Last 7 month average | 2 Weeks |
| 6013 Depreciation Expense | - | Excluded | 2 Weeks |
| 6015 Entertainment - Meals | 423 | Last 7 month average | 2 Weeks |
| 6019 Insurance - General and Property Liability | - | Estimated to be zero | 2 Weeks |
| 6021 Insurance - Professional Liability | - | Estimated to be zero | 2 Weeks |
| 6023 Interest Expense | 1,556 | Last 7 month average | 2 Weeks |
| 6024 Licenses - Medical | 672 | Last 7 month average | 2 Weeks |
| 6025 Licenses - Software | 5,597 | Last 7 month average | 2 Weeks |
| 6027 Medical Equipment Expense | - | Estimated to be zero | 2 Weeks |
| 6028 Medical Supplies | 12,126 | Last 7 month average | 2 Weeks |
| 6031 Office Cleaning | 2,574 | Last 7 month average | 2 Weeks |
| 6032 Office Furniture & Equipment Expense | - | Estimated to be zero | 2 Weeks |
| 6033 Office Shipping, Freight & Delivery | - | Estimated to be zero | 2 Weeks |
| 6035 Office Supplies | 3,420 | Last 7 month average | 2 Weeks |
| 6039 Other Fees | 1,997 | Last 7 month average | 2 Weeks |
| 6043 Outreach Gas | 837 | Last 7 month average | 2 Weeks |
| Payroll Related Expenses: |  |  |  |
| 6080 Taxes (Including EE Witholdings) | 120,980 | Most Recent Period | 2 Weeks |
| 6095 Wages (Less EE Witholdings) | 282,696 | Most Recent Period | 2 Weeks |
| 6018 Insurance - Dis/Life/Vision (Including EE Witholdings) | 11,210 | Actual Planned | May 2023 |
| 6020 Insurance - Health/Dental (Including EE Witholdings) | 67,292 | Most Recent Period | 2 Weeks |
| Flex Spending (FSA) (Including EE Witholdings) | 4,881 | Most Recent Period | 2 Weeks |
| Retirement (Including EE Witholdings) | 39,483 | Most Recent Period | 2 Weeks |
| 6051 Professional Fees - Accounting | 2,501 | Last 7 month average | 2 Weeks |
| 6053 Professional Fees - Legal | 89,603 | Last 7 month average | 2 Weeks |
| 6054 Professional Fees - Medical | 2,017 | Last 7 month average | 2 Weeks |
| 6055 Professional Fees - IT | 4,490 | Last 7 month average | 2 Weeks |
| 6056 Professional Fees - Pharmacy | 1,725 | Last 7 month average | 2 Weeks |
| 6058 Promotional - Business Development | 353 | Last 7 month average | 2 Weeks |
| 6062 Promotional - Marketing | 1,099 | Last 7 month average | 2 Weeks |
| 6063 Promotional - Recruiting Expense | 4,797 | Last 7 month average | 2 Weeks |
| 6064 Rent - Equipment | 19,359 | Actual Planned | May 2023 |
| 6065 Rent - Space | 85,428 | Actual Planned | May 2023 |
| 6092 Utilities - Telephone and Internet | 7,834 | Most Recent Period | May 2023 |
| 6093 Utilities - Electricity | 3,831 | Most Recent Period | May 2023 |
| 6097 Waste | 430 | Last 7 month average | 2 Weeks |
| Total 8020 Research Expense | 545 | Last 7 month average | 2 Weeks |
| Advertising | 3,333 | Last 7 month average | 2 Weeks |
| Consulting Fees | 930 | Last 7 month average | 2 Weeks |

**EXHIBIT "A"**

**Two-Week Budget**
**Period of April 22, 2023 thru May 5, 2023**

| | | | |
|---|---:|---|---|
| Continuing Education | 958 | Last 7 month average | 2 Weeks |
| Contract Labor | 72,296 | Average per analysis | 2 Weeks |
| Entertainment - Meals 100% | 747 | Last 7 month average | 2 Weeks |
| Professional Fees - Other | 2,552 | Last 7 month average | 2 Weeks |
| Reimbursements | 1,694 | Last 7 month average | 2 Weeks |
| Repair & Maintenance | 2,145 | Last 7 month average | 2 Weeks |
| Training | 314 | Last 7 month average | 2 Weeks |
| Travel | 1,839 | Last 7 month average | 2 Weeks |
| | | | |
| **Total Expenses** | **869,149** | | |
| | | | |
| **Net Income / (Loss)** | **92,203** | | |