IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| IN RE: | MISSISSIPPI CENTER FOR ADVANCED MEDICINE, P.C. | CHAPTER 11 |
| | | CASE NO. 23-00962-JAW |
| | Debtor | |

**DEBTOR'S MOTION FOR AN ORDER (I) APPROVING PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT TO UTILITY COMPANIES; (II) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES; (III) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING THE SERVICE; AND (IV) GRANTING RELATED RELIEF**

COMES NOW Mississippi Center for Advanced Medicine, P.C. (the "Debtor") and files this its *Motion for an Order (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing the Service; and (IV) Granting Related Relief* (the " Utilities Motion"), and in support thereof, would respectfully show as follows, to-wit:

## JURISDICTION

1. On April 21, 2023 (the "Petition Date") the Debtor filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.C.S. § 101 *et seq.* (the "Bankruptcy Code") commencing this bankruptcy case. The Debtor has elected to proceed under Subchapter V of Chapter 11. The Debtor is operating its business and managing its properties as a Debtor-in-Possession pursuant to Sections 1182(2) and 1184 of the Bankruptcy Code.

2. This Honorable Court has jurisdiction of the subject matter herein and the parties hereto pursuant to 28 U.S.C. §§ 157 and 1334; 11 U.S.C. §§ 105, 363, 366, 1107, 1109, 1184, 1186, related statutes, related rules and various orders of reference. This is a core proceeding. Venue is proper in this Court pursuant to 11 U.S.C. §§ 1408 and 1409.

## **GENERAL BACKGROUND**

3.     The Debtor was founded on July 1, 2016 by Dr. Spencer Sullivan, a Pediatric Hematologist and sole owner of the professional corporation. The Debtor's goal was to create another option for pediatric specialty care in Mississippi while improving the quality of pediatric care in the state.

4.     Jordan Robinson is the Vice President and Chief Operating Officer of the Debtor, and provides operational, service line strategic management, strategic planning, and analytical support for the Debtor.

5.     The Debtor currently employs 18 pediatric related specialty positions along with four additional pediatric providers encompassing 16 medical specialties, including but not limited to:

- Pediatric Allergy, Asthma, and Immunology (also serving adults for the full spectrum of care)
- Pediatric Audiology
- Pediatric Cardiology
- Pediatric Chronic Pain
- Pediatric Dietary and Nutrition
- Pediatric Endocrinology
- Pediatric Hematology (also serves adults with bleeding disorders and sickle cell disease)
- Pediatric Hospital Medicine (MCAM provides inpatient pediatric care at Mississippi Baptist Medical Center in Jackson and Baptist Memorial Hospital - North Mississippi in Oxford)
- Pediatric Mental Health Therapy
- Pediatric Metabolic Medicine (specializing in healthy weight for children)
- Pediatric Plastic Surgery (also serves adults for certain conditions)
- Pediatric Pulmonology
- Pediatric Rheumatology
- Pediatric Speech and Language Pathology
- Pediatric Urgent Care
- Maternal Fetal Medicine (high risk obstetrics)

-3-

6. All of the physicians and providers employed by the Debtor treat pediatric patients regardless of ability to pay, including children on Medicaid, CHIP (Children's Health Insurance Program), commercial insurance, TriCare and uninsured patients.

7. The Debtor's operating budget for the 2023 fiscal year is approximately $60,000,000 and encompasses about 100 employees.

8. The Debtor's primary (specialty care) facilities and offices are located at 401 Baptist Drive, Suite 301, in Madison, MS, and 7330 Old Canton Road, Buildings A & B, in Madison, MS. In December, 2022, the Debtor opened a new urgent care location under the name Pediatric Urgent Care, located at 1200 North State Street, Suite 180, in Jackson, MS.

9. The Debtor also has a northern Mississippi satellite office located at 330 West Jefferson Street in Tupelo, MS, and a Louisiana Center for Advanced Medicine located at 2053 Gause Blvd East, Suite 200, Slidell, LA.

10. Additionally, the Debtor sends its employed physicians and providers to certain outreach locations in Mississippi where patients may be seen by a specialist closer to home. These outreach locations include Columbus, Hattiesburg, McComb, Oxford, Ruleville and Southaven.

11. By working across the state in so many locations, the Debtor strives to provide a medical home concept for children with chronic conditions. In addition to the pediatric specialists, there are social workers, clinical pharmacists and other dedicated clinical personnel including, but not limited to, nurses, medical assistants, laboratory specialists and sonographers that work in unison to provide the right care at the right time at the right place.

12. The Debtor's social workers help address patient families' social determinants of health and often help patients with Medicaid enrollment, transportation issues and with a variety of other concerns.

13. The Debtor also maintains a pediatric clinical pharmacy which provides and manages both retail and specialty medications. Specialty medications are drugs that are used to treat complex and chronic diseases. These drugs require special storage, handling, and administration, necessitate extensive patient education, and require greater clinical support to maximize patient outcomes. In addition to medical providers, the Debtor's clinical pharmacists see patients on specialty medications when they visit the center. The Debtor's clinical pharmacists and providers collaborate together to add significant value to patient care both during and outside of regular office visits. Integrating medical and pharmaceutical services provides safe, timely, and quality care to patients and their families.

14. In addition to clinical care, the Debtor also has a research department conducting clinical research, including Phase I-IV industry-sponsored clinical trials and federally funded projects.

15. The Debtor also hosts students from a variety of disciplines and is about to welcome its second Pediatric Audiology resident. Other educational professions rotating through the Debtor's facilities have included high school and college students interested in the medical field, medical students, nursing students, audiology students, physician assistant and nurse practitioner students.

16. Clinicians and providers for the Debtor have also adopted the "Comfort Promise", which is an international practice to help prevent and minimize pain, discomfort, and fear of needle and other procedures, especially in children.

17. For the calendar year 2022, sub-specialists for the Debtor received approximately 8,720 referrals from pediatricians, family physicians, nurse practitioners, physician assistants and other providers across Mississippi and beyond. The Debtor's clinicians completed approximately 21,553 patient visits in 2022 and are on pace for approximately 26,876 patient visits for 2023. There

is a high demand for pediatric specialty services in the state of Mississippi and that additional clinicians are needed in a variety of areas to meet the demand.

18.  The Debtor is in the process of adding additional resources to its staff in September of 2023 including a Pediatric Allergist, and also a Child Psychiatrist who is slated to join Pediatric Mental Health department in September.

## PRE-PETITION LITIGATION BACKGROUND

19.  Over a year after MCAM opened its doors, University of Mississippi Medical Center ("UMMC") filed a lawsuit on July 14, 2017, in the Circuit Court of Hinds County, Mississippi, Cause No. 17-410, against MCAM, Dr. Sullivan, and Dr. Nina Washington ("Dr. Washington") who was an employee of MCAM that MCAM recruited from UMMC. Nearly two years later - and almost three years after MCAM began - UMMC filed a second lawsuit on June 28, 2019, in the United States District Court for the Southern District of Mississippi, Case No. 3:19-cv-459, against MCAM and Dr. Sullivan, along with former UMMC employees Linnea McMillan, Sue Stevens, and Rachel Henderson Harris. Years later, these lawsuits remain pending and MCAM continues to vigorously defend itself.

20.  The claims in the two lawsuits largely overlap and center around UMMC's allegation that Dr. Sullivan, for various reasons, did not open MCAM properly and that he and Dr. Washington were contractually prohibited from practicing medicine near UMMC after leaving there. Since the filing of the federal action, the litigation has focused on UMMC's federal trademark claims and a spreadsheet identifying 168 hemophilia patients (the "Patient List") who received care at UMMC. UMMC contends that this Patient List was a trade secret and that it was improperly taken so MCAM could use it to solicit these patients to transfer their clinical care and pharmacy orders from UMMC to MCAM after Dr. Sullivan left.

21. Although MCAM denies that the Patient List is a trade secret and maintains that Dr. Sullivan had the right and need to use patient information for purposes of patient care and guaranteeing a smooth transition for patients once he left UMMC, the federal court has ruled that UMMC has prevailed on the question of trade secret liability. Despite MCAM's defenses to UMMC's claims that taking a copy of the Patient List was improper, a default judgment has been entered against MCAM and the individual defendants in UMMC's federal lawsuit due to instances of discovery misconduct. Nurses McMillan and Stevens and former MCAM employee Nurse Henderson were untruthful in depositions in the state court lawsuit when asked if a copy of the Patient List was taken from UMMC to MCAM. Separately, Dr. Sullivan was untruthful in his deposition when he denied possessing an external hard drive and thumb drive that contained emails from Dr. Sullivan's time at UMMC, as well as sensitive and private information that would have caused unnecessary embarrassment if produced.

22. Dr. Sullivan attested to the fact that no one at MCAM had anything to do with, or any knowledge of, his withholding the external drives. Similarly, Stevens and McMillan stated that no one requested or authorized their conduct. Nonetheless, the federal court imposed a default judgment on MCAM, Dr. Sullivan, Nurse McMillan, and Nurse Stevens. UMMC earlier dismissed its claims against Nurse Henderson. A damages-only jury trial is set to begin on October 30, 2023, regarding the amount that MCAM and the other remaining defendants in the federal case were unjustly enriched as a result of misappropriating UMMC's trade secrets (primarily, the Patient List).

23. In the federal litigation, UMMC is not seeking *any* lost profits. UMMC's damages claim is based solely on an unjust-enrichment theory claiming that MCAM should be disgorged from any profits related to pharmacy charges for the patients on the Patient List even if UMMC did not lose any profits as a result. UMMC seeks to disgorge MCAM of all of these profits since opening

nearly six years ago, in the amount of close to $30 million. In addition, UMMC seeks punitive damages against MCAM in an amount that could total close to $90 million, plus UMMC's attorneys' fees. UMMC's damages theory posits that it should receive, in perpetuity, MCAM's pharmacy profits flowing from the hemophilia patients who continued their care with Dr. Sullivan at MCAM.

24. MCAM has retained an expert witness who believes that UMMC's potential damages are significantly lower than what UMMC contends. MCAM's expert will likely testify that UMMC's unjust enrichment damages are minimal, if any. However, even working from the analysis of MCAM's damages expert, depending on how a jury approaches the calculation of damages and how long they conclude the damages period is, it is possible that UMMC's damages exceed MCAM's ability to pay.

25. UMMC seeks to disgorge multi-million dollars of MCAM's pharmacy-related profits even though MCAM's clinic-wide operations resulted in modest profits in some years and modest losses in other years. Despite this modest financial performance, MCAM considers itself to be a successful enterprise because of its ever-growing ability to service numerous pediatric sub-specialties in a state that perennially receives low marks for the quality of pediatric healthcare services.

### A. Debtor's Utilities

26. The Debtor has the normal, customary utilities including, but not limited to, electricity, telecommunications, natural gas, water, waste disposal and other similar services (collectively, the "Utility Services") from a number of utility companies (collectively the "Utility Companies"), which are generally paid on a monthly basis.

27. Based on their estimated monthly average, the Debtor estimates that the average it will be required to spend per month on utility services is $27,000.00.

28. Preserving, uninterrupted, utility services is essential to obtain and keep insurance, to protect and preserve the estate's assets and properties and to administer this case.

29. To the best of the Debtor's knowledge there are no defaults or arrearages due to non-payment of utility services.

### B. Proposed Adequate Assurance

30. The Debtor intends to pay all post-petition obligations owed to Utility Companies in a timely manner. To provide the Utility Companies with Adequate Assurance pursuant to Section 366 of the Bankruptcy Code, the Debtor proposes to (a) maintain all deposits; and (b) continue to pay, as and when due, all Utility Services, charges, fees, and costs.

31. The Debtor estimates that the total amount of Utility Services will be approximately $27,000 per month, an amount that has been, and is, available to be paid from the Debtor's cash flow.

32. The Debtor submits that its agreement to pay for Utility Services, consistent with its past practices, combined with the deposits held by the various Utility Services constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of Section 366 of the Bankruptcy Code.

### C. Proposed Adequate Assurance Procedures

33. Any Utility Company that is not satisfied with the proposed adequate assurance may request additional or different adequate assurance and future payment (the "Adequate Assurance Procedures") pursuant to the procedures set forth below:

   (i) Within three business days after entry of any order granting the Motion, the Debtor shall email, serve my mail or otherwise expeditiously distribute a

    copy of the Motion and any order granting it to the Utility Companies on the Utility Services list;

(ii)  The Adequate Assurance Payment shall constitute Adequate Assurance for each Utility Company in the amounts set forth for each Utility Company on the Utility Services list;

(iii)  If an amount relating to Utility Services provided post-petition by a Utility Company is unpaid, and remains unpaid beyond any applicable grace period, such Utility Company may request additional assurance by giving notice to (a) counsel to the Debtor; (b) the Office of the United States Trustee; (c) the Subchapter V Trustee (upon appointment); and (d) counsel for any lender or secured creditor that may exist.  The Debtor shall honor such request within five business days after the request is received, subject to the opportunity of the Debtor and any such requesting Utility Company to resolve disputes relating to such requests without further order of the Court;

(iv)  Any Utility Company desiring additional assurances of payment or otherwise must serve a request for additional assurance (the "Additional Assurance Request") on the Debtor, Debtor's counsel, Subchapter V Trustee and the United States Trustee;

(v)  The Additional Assurance Request must (a) be made in writing; (b) set forth the location for such utility services being provided, the account number for such location and the outstanding balance for each such account; (c) summarize the Debtor's post-petition payment history relevant to the affected account, including any security deposits; and (d) explaining why the utility

company believes the proposed Adequate Assurance is not sufficient Adequate Assurance of future payment.

(vi) An Additional Assurance Request may be made at any time. If a Utility Company does not file and serve an Additional Assurance Request, the Utility Company will be (a) deemed to have received "satisfactory" Adequate Assurance of payment and compliance with Section 366 of the Bankruptcy Code, and (b) forbidden from discontinuing, altering or refusing Utility Services to, or discriminating against, the Debtor on account of any unpaid pre-petition charges or requiring additional assurance of payment other than the Proposed Adequate Assurance.

(vii) If the Debtor and the Utility Company are not able to reach a resolution within fourteen (14) days of the receipt of the Additional Assurance Request, the Debtor will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Company and provider pursuant to Section 366(c)(3) of the Bankruptcy Code.

## RELIEF REQUESTED

34. The relief requested in the Motion will ensure the preservation and protection of the Debtor's estate at this critical juncture. The relief requested also provides Utility Companies with a fair and early procedure for determining requests for Additional Adequate Assurance, without which the Debtor could be forced to address multiple requests by Utility Companies in a disorganized manner.

### A. Proposed Adequate Assurance is Sufficient

35. Sections 366 of the Bankruptcy Code is designed to serve the dual purposes of protecting a Debtor from being cut off from Utility Services and providing Utility Companies with "Adequate Assurance" that the Debtor will be able to pay for post-petition services.

36. To that end, pursuant to Section 366(c) of the Bankruptcy Code, during the first thirty (30) days of the Chapter 11 case, a Utility Company may not alter, refuse or discontinue the service to, or discriminate against, a Debtor solely on the basis of the commencement of the Chapter 11 case or on the unpaid pre-petition amounts, but after the first thirty (30) days a Utility Company may alter, refuse, or discontinue service if the Debtor does not provide Adequate Assurance of payment for post-petition Utility Services in satisfactory form.

37. Although Section 366(c) of the Bankruptcy Code clarifies what does and does not constitute "Assurance of Payment" and what can be considered in determining whether such assurance is adequate, Congress, in enacting such Section, did not divest the Court of its power to determine what amount, if any, is necessary to provide adequate assurance of payment to a Utility Company. Specifically, Section 366(c)(3)(A) states that "[o]n request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment . . ." Accordingly, there is nothing to prevent a court from deciding, whether facts of the case before it, that the amount required of a debtor to provide adequate assurance of payment to a utility company should be nominal or even zero. See, e.g., *In re SQLC Senior Living Ctr. at Corpus Christi, Inc.*, Case No. 19-20063 (DRJ) (Bankr. S.D. Tex. February 12, 2019) (Dk. 40); *In re Pac-West Telecomm, Inc.*, Case No. 07-10562 (BLS) (Bankr. D. Dl. May 2, 2007) (Dk. 39) (approving adequate assurance in the form of one time supplemental pre-payment to each utility company equal to the prorated amount of one weeks charges.) Prior to the enactment of Section 366(c), Courts

frequently made rulings pursuant to Section 366(b) *CVA. Elec. and Power Co. v. Caldor, Inc.,* 117 F.3d 646, 650 (2d Cir. 1997).

38. Although Section 366(c)(2) of the Bankruptcy Code allows Utility Companies to take action if the Debtor fails to provide Adequate Assurance of payment that is "satisfactory" to the Utility, it is the Bankruptcy Court and not the utility provider that is the ultimate arbiter of what is "satisfactory" assurance after taking into consideration the relationship between the Debtor and the utility. See e. g. *In re Penn Cent. Transp. Co.,* 467 F.2d 100, 103-04 (3d Cir. 1972); See also *In re Heard*, 84 B.R. 454, 459 (Bankr. W.D. Tex. 1987).

39. Bankruptcy Courts in the 5th Circuit have consistently approved procedures of amounts equal to or less than those proposed by the Debtor, especially considering the relatively small amount of utility costs on a monthly basis.

**B. Adequate Assurance Procedures are reasonable and appropriate.**

40. The Adequate Assurance Procedures here are necessary and appropriate to carry out the provisions of the Bankruptcy Code, particularly Section 366.

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully prays that upon a hearing hereof this Honorable Court will grant the Motion. Debtor prays for general relief.

THIS, the 25th day of April, 2023.

Respectfully submitted,

MISSISSIPPI CENTER FOR ADVANCED MEDICINE, P.C.

By Its Attorneys,

LAW OFFICES OF CRAIG M. GENO, PLLC

By: _____
Craig M. Geno

OF COUNSEL:

Craig M. Geno; MSB No. 4793
LAW OFFICES OF CRAIG M. GENO, PLLC
587 Highland Colony Parkway
Ridgeland, MS 39157
601-427-0048 - Telephone
601-427-0050 - Facsimile
cmgeno@cmgenolaw.com

N:\Firm Data\Users\Bankrupt\MS Center for Advanced Medicine\Pleadings\Mot Approving Proposed Form of Adequate Assurance for Utilities 4-19-23.wpd

## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via electronic filing transmission and/or U. S. Mail, postage prepaid, a true and correct copy of the above and foregoing to the following:

Christopher J. Steiskal, Esq.
christopher.j.steiskal@usdoj.gov

THIS, the 25th day of April, 2023.

_____
Craig M. Geno