## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| IN RE: | MISSISSIPPI CENTER FOR ADVANCED MEDICINE, P.C.<br>Debtor | CHAPTER 11<br>CASE NO. 23-00962-JAW |

### EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO (A) PAY PRE-PETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION AND REIMBURSABLE EMPLOYEE EXPENSES, (B) CONTINUE EMPLOYEE BENEFIT PROGRAMS AND (C) GRANTING OTHER RELIEF

COMES NOW Mississippi Center for Advanced Medicine, P.C. (the "Debtor") and files this its *Emergency Motion for Entry of an Order Authorizing the Debtor to (A) Pay Pre-Petition Employee Wages, Salaries, Other Compensation and Reimbursable Employee Expenses, (B) Continue Employee Benefit Programs and (C) Granting Other Relief* (the "Employee Wage Motion"), and in support thereof, would respectfully show as follows, to-wit:

### JURISDICTION

1. On April 21, 2023 (the "Petition Date"), the Debtor filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.C.S. § 101 *et seq.* (the "Bankruptcy Code") commencing this bankruptcy case. The Debtor has elected to proceed under Subchapter V of Chapter 11. The Debtor is operating its business and managing its properties as a debtor-in-possession pursuant to Sections 1182(2) and 1184 of the Bankruptcy Code.

2. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334; 11 U.S.C. §§ 105, 363, 541, 1107, 1109, 1184, 1186, related statutes, related rules and various orders of reference. This is a core proceeding. Venue of this case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## **GENERAL BACKGROUND**

3. The Debtor was founded on July 1, 2016 by Dr. Spencer Sullivan ("Dr. Sullivan"), a Pediatric Hematologist and sole owner of the professional corporation. The Debtor's goal was to create another option for pediatric specialty care in Mississippi while improving the quality of pediatric care in the state.

4. Jordan Robinson is the Vice President and Chief Operating Officer of the Debtor, and provides operational, service line strategic management, strategic planning, and analytical support for the Debtor.

5. The Debtor currently employs 18 pediatric related specialty positions along with four additional pediatric providers encompassing 16 medical specialties, including but not limited to:

- Pediatric Allergy, Asthma, and Immunology (also serving adults for the full spectrum of care)
- Pediatric Audiology
- Pediatric Cardiology
- Pediatric Chronic Pain
- Pediatric Dietary and Nutrition
- Pediatric Endocrinology
- Pediatric Hematology (also serves adults with bleeding disorders and sickle cell disease)
- Pediatric Hospital Medicine (MCAM provides inpatient pediatric care at Mississippi Baptist Medical Center in Jackson and Baptist Memorial Hospital - North Mississippi in Oxford, two of Mississippi's highest performing hospitals
- Pediatric Mental Health Therapy
- Pediatric Metabolic Medicine (healthy weight for children)
- Pediatric Plastic Surgery (also serves adults for certain conditions)
- Pediatric Pulmonology
- Pediatric Rheumatology
- Pediatric Speech and Language Pathology
- Pediatric Urgent Care
- Maternal Fetal Medicine (high risk obstetrics)

6. All of the physicians and providers employed by the Debtor treat pediatric patients regardless of ability to pay, including children on Medicaid, CHIP (Children's Health Insurance Program), commercial insurance, TriCare and uninsured patients.

7. The Debtor's operating budget for the 2023 fiscal year is approximately $60,000,000 and encompasses about 100 employees.

8. The Debtor's primary (specialty care) facilities and offices are located at 401 Baptist Drive, Suite 301, in Madison, MS, and 7330 Old Canton Road, Buildings A & B, in Madison, MS. In December, 2022, the Debtor opened a new urgent care location under the name Pediatric Urgent Care, located at 1200 North State Street, Suite 180, in Jackson, MS.

9. The Debtor also has a northern Mississippi satellite office located at 330 West Jefferson Street in Tupelo, MS, and a Louisiana Center for Advanced Medicine located at 2053 Gause Blvd East, Suite 200, Slidell, LA.

10. Additionally, the Debtor sends its employed physicians and providers to certain outreach locations in Mississippi where patients may be seen by a specialist closer to home. These outreach locations include Columbus, Hattiesburg, McComb, Oxford, Ruleville and Southaven.

11. By working across the state in so many locations, the Debtor strives to provide a medical home concept for children with chronic conditions. In addition to the pediatric specialists, there are social workers, clinical pharmacists and other dedicated clinical personnel including, but not limited to, nurses, medical assistants, laboratory specialists and sonographers that work in unison to provide the right care at the right time at the right place.

12. The Debtor's social workers help address patient families social determinants of health and often help patients with Medicaid enrollment, transportation issues and with a variety of other concerns.

13. The Debtor also maintains a pediatric clinical pharmacy which provides and manages both retail and specialty medications. Specialty medications are drugs that are used to treat complex and chronic diseases. These drugs require special storage, handling, and administration, necessitate extensive patient education, and require greater clinical support to maximize patient outcomes. In addition to medical providers, the Debtor's clinical pharmacists see patients on specialty medications when they visit the center. The Debtor's clinical pharmacists and providers collaborate together to add significant value to patient care both during and outside of regular office visits. Integrating medical and pharmaceutical services provides safe, timely, and quality care to patients and their families.

14. In addition to clinical care, the Debtor also has a research department conducting clinical research, including Phase I-IV industry-sponsored clinical trials and federally funded projects.

15. The Debtor also hosts students from a variety of disciplines and is about to welcome its second Pediatric Audiology resident. Other educational professions rotating through the Debtor's facilities have included high school and college students interested in the medical field, medical students, nursing students, audiology students, physician assistant and nurse practitioner students.

16. Clinicians and providers for the Debtor have also adopted the "Comfort Promise", which is an international practice to help prevent and minimize pain, discomfort, and fear of needle and other procedures, especially in children.

17. For the calendar year 2022, subspecialists for the Debtor received approximately 8,720 referrals from pediatricians, family physicians, nurse practitioners, physician assistants and other providers across Mississippi and beyond. The Debtor's clinicians completed approximately 21,553 patient visits in 2022 and are on pace for approximately 26,876 patient visits for 2023. There

is a high demand for pediatric specialty services in the state of Mississippi and that additional clinicians are needed in a variety of areas to meet the demand.

18. The Debtor is in the process of adding additional resources to its staff in September of 2023 including a Pediatric Allergist, and also a Child Psychiatrist who is slated to join Pediatric Mental Health department in September.

## PRE-PETITION LITIGATION BACKGROUND

19. Over a year after MCAM opened its doors, University of Mississippi Medical Center ("UMMC") filed a lawsuit on July 14, 2017, in the Circuit Court of Hinds County, Mississippi, Cause No. 17-410, against MCAM, Dr. Sullivan, and Dr. Nina Washington ("Dr. Washington") who was an employee of MCAM that MCAM recruited from UMMC. Nearly two years later - and almost three years after MCAM began - UMMC filed a second lawsuit on June 28, 2019, in the United States District Court for the Southern District of Mississippi, Case No. 3:19-cv-459, against MCAM and Dr. Sullivan, along with former UMMC employees Linnea McMillan, Sue Stevens, and Rachel Henderson Harris. Years later, these lawsuits remain pending and MCAM continues to vigorously defend itself.

20. The claims in the two lawsuits largely overlap and center around UMMC's allegation that Dr. Sullivan, for various reasons, did not open MCAM properly and that he and Dr. Washington were contractually prohibited from practicing medicine near UMMC after leaving there. Since the filing of the federal action, the litigation has focused on UMMC's federal trademark claims and a spreadsheet identifying 168 hemophilia patients (the "Patient List") who received care at UMMC. UMMC contends that this Patient List was a trade secret and that it was improperly taken so MCAM could use it to solicit these patients to transfer their clinical care and pharmacy orders from UMMC to MCAM after Dr. Sullivan left.

21. Although MCAM denies that the Patient List is a trade secret and maintains that Dr. Sullivan had the right and need to use patient information for purposes of patient care and guaranteeing a smooth transition for patients once he left UMMC, the federal court has ruled that UMMC has prevailed on the question of trade secret liability. Despite MCAM's defenses to UMMC's claims that taking a copy of the Patient List was improper, a default judgment has been entered against MCAM and the individual defendants in UMMC's federal lawsuit due to instances of discovery misconduct. Nurses McMillan and Stevens and former MCAM employee Nurse Henderson were untruthful in depositions in the state court lawsuit when asked if a copy of the Patient List was taken from UMMC to MCAM. Separately, Dr. Sullivan was untruthful in his deposition when he denied possessing an external hard drive and thumb drive that contained emails from Dr. Sullivan's time at UMMC, as well as sensitive and private information that would have caused unnecessary embarrassment if produced.

22. Dr. Sullivan attested to the fact that no one at MCAM had anything to do with, or any knowledge of, his withholding the external drives. Similarly, Stevens and McMillan stated that no one requested or authorized their conduct. Nonetheless, the federal court imposed a default judgment on MCAM, Dr. Sullivan, Nurse McMillan, and Nurse Stevens. UMMC earlier dismissed its claims against Nurse Henderson. A damages-only jury trial is set to begin on October 30, 2023, regarding the amount that MCAM and the other remaining defendants in the federal case were unjustly enriched as a result of misappropriating UMMC's trade secrets (primarily, the Patient List).

23. In the federal litigation, UMMC is not seeking *any* lost profits. UMMC's damages claim is based solely on an unjust-enrichment theory claiming that MCAM should be disgorged from any profits related to pharmacy charges for the patients on the Patient List even if UMMC did not lose any profits as a result. UMMC seeks to disgorge MCAM of all of these profits since opening

nearly six years ago, in the amount of close to $30 million. In addition, UMMC seeks punitive damages against MCAM in an amount that could total close to $90 million, plus UMMC's attorneys' fees. UMMC's damages theory posits that it should receive, in perpetuity, MCAM's pharmacy profits flowing from the hemophilia patients who continued their care with Dr. Sullivan at MCAM.

24. MCAM has retained an expert witness who believes that UMMC's potential damages are significantly lower than what UMMC contends. MCAM's expert will likely testify that UMMC's unjust enrichment damages are minimal, if any. However, even working from the analysis of MCAM's damages expert, depending on how a jury approaches the calculation of damages and how long they conclude the damages period is, it is possible that UMMC's damages exceed MCAM's ability to pay.

25. UMMC seeks to disgorge multi-million dollars of MCAM's pharmacy-related profits even though MCAM's clinic-wide operations resulted in modest profits in some years and modest losses in other years. Despite this modest financial performance, MCAM considers itself to be a successful enterprise because of its ever-growing ability to service numerous pediatric subspecialties in a state that perennially receives low marks for the quality of pediatric healthcare services.

## THE DEBTOR'S EMPLOYEES

26. As of the Petition Date, the Debtor's workforce consists of approximately 88 full time employees, which are paid on a salary basis, and 43 which are paid on an hourly basis or otherwise (collectively, the "Employees"). Many of the Employees are paid in arrears on a bi-weekly basis. The Debtor also has several independent contractors (the "Independent Contractors") in various capacities.

27. The Employees perform a variety of functions critical to the preservation of value of the Debtor's assets and to the administration of the Debtor's estate and this Chapter 11 case. The

Employees include personnel who are intimately familiar with the Debtor's business, processes, procedures, and systems, and who cannot be easily replaced. In the Debtor's medical practice, specialized and critical employees are the norm. Without the continued, uninterrupted service of the Employees, the ability of the Debtor to maximize the value of its estate and reorganize will be materially impaired.

28. The Employees rely on their compensation and benefits to pay their daily living expenses. The Employees would be exposed to significant financial constraints if the Debtor is not permitted to continue paying the Employees' compensation and providing the Employees with health and other benefits. Consequently, the Debtor respectfully submits that the relief requested herein is necessary and appropriate under the facts and circumstance of this Chapter 11 case.

29. To minimize the personal hardship the Employees would suffer if pre-petition employee-related obligations were not paid when due or as expected, and to maintain stability of the Debtor's workforce during the administration of the Debtor's Chapter 11 case, the Debtor, by this Employee Wage Motion, seeks authority, but not direction, to: (i) pay and honor certain pre-petition claims relating to, among other things, wages, salaries, and other compensation, federal and state withholding taxes, and other amounts withheld (including garnishments and taxes), reimbursable expenses, health and related benefits, and certain other benefits that the Debtor has historically paid in the ordinary course of business (collectively, the "Employee Compensation and Benefits"); and (ii) pay all costs incident to the Employee Compensation and Benefits.

30. Subject to approval from the Court, the Debtor intends to continue its applicable pre-petition Employee Compensation and Benefits in the ordinary course of business. Out of an abundance of caution, the Debtor further requests confirmation of its right to modify, change and discontinue any of its Employee Compensation and Benefits and to implement new programs,

policies and benefits in the ordinary course of business during this Chapter 11 case and the Debtor's sole discretion and without the need for further Court approval, subject to applicable law. By this Employee Wage Motion, the Debtor seeks authority to make the following approximate payments relating to pre-petition amounts owed on account of the Employee Compensation and Benefits:

### A. Employee Compensation

31. In the ordinary course of business, the Debtor incurs obligations to its Employees for, among other things, wages, salaries and other obligations described herein (collectively, the "Employee Compensation").

32. The Debtor estimates that its monthly gross payroll liability (excluding Independent Contractors) is approximately $924,216.00 (10 months at $853,122.17 and 2 months at $1,279,683.26) and monthly payroll taxes covered by the Debtor amount to an additional $69,148.98. As of the Petition Date, the Debtor owes approximately $213,280.54 in gross wages for its Employees (the "Unpaid Compensation") and approximately $15,957.46 of the Debtor's portion of the Employees' payroll taxes. In addition, the amount owed to the Independent Contractors as of the Petition Date is approximately $10,000.00. The first post-petition payroll is due to be paid on May 5, 2023.

33. As described above, if the Debtor fails to pay the Unpaid Compensation, it could result in extreme financial hardship for its Employees - and great risk to the Debtor if Employees suffering from financial hardship choose to leave. In light of the substantial benefit the Employees will continue to provide to the Debtor's estate, the Debtor wishes to avoid imposing such a hardship on the Employees.

34. Accordingly, by this Employee Wage Motion the Debtor seeks authority to pay the Employees any Unpaid Compensation in the ordinary course of business and consistent with past

practice and continue the Employee Compensation in the ordinary course of business. For the avoidance of doubt, by this Employee Wage Motion the Debtor does not seek to pay Unpaid Compensation to any Employee in excess of the $15,150 priority wage cap imposed by Section 507(a)(4) of the Bankruptcy Code.

35. During each applicable payroll period, the Debtor routinely deducts certain amounts from Employees' paychecks, including child support, garnishments and similar deductions (collectively, the "Deductions"), and forward such amounts to the appropriate third-party recipients.

36. In addition to the Deductions, certain federal and state laws require that the Debtor withhold certain amounts from Employees' gross pay relating to federal, state and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities. The Debtor must then match the Employee Payroll Taxes from its own funds and pay, based upon a percentage of gross payroll, additional amounts with federal and state unemployment insurance, Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed. As of the Petition Date, the Debtor estimates that it will have approximately $16,957.46 in unpaid deductions and Payroll Taxes (together, the "Withholding Obligations") outstanding, all of which will come due within the first 21 days of this Chapter 11 case. By this Employee Wage Motion, the Debtor seeks authority to pay, in a manner consistent with historical practice, any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course during the administration of this case.

### B. Employee Benefit Programs

### (i) Health Benefit Plan

37. The Debtor offered its full-time Employees an opportunity to participate in a health benefit plan provided by Blue Cross Blue Shield of Mississippi (the "Health Benefit Plan"). As of the Petition Date, the Debtor does not owe any pre-petition amounts related to the Health Benefit Plan [or it owes $50,282.98 related to the Health Benefit Plan]. The Debtor's monthly obligation under the Health Benefit Plan is $50,282.98 with the full payment of over $72,000 per month.

### (ii) Paid Time Off

38. The Debtor provides vacation time to its full-time Employees as a paid time off benefit ("Paid Time Off"). Employees accrue vacation time based on their number of months in service. Staff Employees employed by the Debtor receive 10 paid holidays for two weeks or 20 days of paid time off. After five years of services, Staff time off goes up to 25 days off and after 10 years of service, Staff receive 30 days off per year. Physicians and leadership are eligible for discretionary time off using best judgment.

39. To the extent there is any accrued and unpaid pre-petition amount now outstanding with respect to Paid Time Off, the Debtor does not seek to pay Paid Time Off to any Employee in excess of the $15,150 priority cap imposed by Section 507(a)(4) of the Bankruptcy Code. Through this Employee Wage Motion, the Debtor also requests authority to continue providing Paid Time Off to its Employees during this Chapter 11 case in the ordinary course of business.

### REQUEST FOR RELIEF

40. By this Employee Wage Motion, the Debtor seeks the entry of an order that: (i) authorizes the Debtor to (a) pay the pre-petition Employee Compensation and Benefits, and (b)

continue the employee benefits program in the ordinary course of business, including the payment of pre-petition obligations relating thereto; and (ii) granting related relief.

### BASIS FOR RELIEF REQUESTED

**I. The Court should grant the relief requested in this Employee Wage Motion pursuant to Sections 363(b), 507(a) and 105(a) of the Bankruptcy Code.**

41. The relief requested in this Employee Wage Motion is authorized under Section 363(b) of the Bankruptcy Code. Section 363(b) provides, in relevant part, that "[t]he [Debtor], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. Section 363(b)(1). Under this section, a court may authorize a debtor to pay certain pre-petition claims. See *In re Ionosphere Clubs, Inc.* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing payment of pre-petition wages pursuant to Section 363(b) of the Bankruptcy Code).

42. Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to Section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. See, e.g., *Inst'l Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("for a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); see also *In re Crutcher Res. Corp*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale . . .").

43. Section 105(a) of the Bankruptcy Code also provides a statutory basis for granting the relief sought herein. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the Bankruptcy Court, and empowers the Bankruptcy Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Court may use its power under Section 105(a) to authorize payment of the Employee Compensation and Benefits under the "Doctrine of Necessity." The "Doctrine of Necessity" functions in a Chapter 11 case as a mechanism by which the Bankruptcy Court can exercise its equitable power to allow payment of critical claims not explicitly authorized by the Bankruptcy Code and further support the relief requested therein. See *In re CoServ, LLC*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "Doctrine of Necessity").

44. The Debtor believes that its enterprise value would be materially impaired by post-petition workforce instability. The relief requested in this Employee Wage Motion is, therefore, a necessary element of the Debtor's efforts to preserve value for its stakeholders. Absent approval of the relief requested in this Employee Wage Motion, key Employees may face significant financial hardship and other risks and could be forced to seek alternative employment opportunities. Ultimately, the maximization of value of the Debtor's estate is inextricably tied to its Employees. The Debtor's Employees are critical to the Debtor's ability to continue its operations and otherwise administer its Chapter 11 case. But the Debtor cannot really replace its human capital if any Employees choose to leave because of their failure to receive their Employee Compensation and Benefits. For this reason, paying the Employee Compensation and Benefits is necessary for the Debtor to avoid unnecessary recruitment and related costs, and to avoid certain operating risks relating to the administration of this Chapter 11 case. Accordingly, payment of the Employee

Compensation and Benefits is warranted under Sections 363(b) and 105(a) of the Bankruptcy Code and the Doctrine of Necessity.

45. Further, the Debtor believes the Employee Compensation and Benefits are entitled to priority under Sections 507(a)(4) and 507 (a)(5) of the Bankruptcy Code. Thus, granting the relief sought in the Employee Wage Motion is likely to only affect the timing of such payments to Employees, and should not negatively affect recoveries for general unsecured creditors.

## II. Payment of Certain Employee Compensation and Benefits Obligations is Required by Law.

46. As set forth herein, the Debtor also seeks authority to pay Deductions of the Employee Payroll Taxes to the appropriate entities and taxing authorities. These amounts generally represent Employee earnings that taxing authorities, Employees and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions including child support payments, are not property of the Debtor's estate because the Debtor has withheld such amounts from Employees' paychecks on the Employees' behalf. See 11 U.S.C. § 541(b). Further, federal and state laws require the Debtor to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authorities. See 26 U.S.C. §§ 6672 and 7501(a); See also *Begier v. IRS*, 496 U.S. 53, 66-67 (1990) (concluding that withholding taxes or property held by Debtor in trust for another and are therefore not property of the Debtor's estate). Because the Deductions and the Employee Payroll Taxes are not property of the Debtor's estate, the Debtor requests authority to transmit the Deductions and the Employee Payroll Taxes to the appropriate parties in the ordinary course of business.

### III. Authorizing and Directing the Debtor's Bank is Appropriate.

47. The Debtor also requests that the Court authorize the Debtor's bank, BankPlus (the "Bank"), to receive, process, honor and pay all checks presented for the payment of and to honor all fund transfer requests made by the Debtor related to, the claims that the Debtor requests authority to pay in this Employee Wage Motion, regardless of whether the checks were presented on fund transfer requests were presented before, on or after the Petition Date, provided that the funds are available in the Debtor's account to cover the checks the fund transfers and that the Bank is authorized to rely on the Debtor's account to cover the checks of fund transfers and that the Bank is authorized to rely on the Debtor's designation of any particular check as approved by the Court.

48. The Debtor has sufficient liquidity to pay the amounts set forth in this Employee Wage Motion in the ordinary course of business and has implemented controls to insure that pre-petition claims will not be paid except as authorized by the Court. The Debtor therefore submits that the payment process and procedures described in this Employee Wage Motion are appropriate.

### **IMMEDIATE RELIEF IS NECESSARY**

49. The Debtor believes that it is entitled to immediate authorization for the relief contemplated by this Employee Wage Motion, pursuant to Fed. R. Bankr. P. 6003, the Court may grant relief regarding a motion to pay all or part of a pre-petition claim within twenty-one (21) days after the petition date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a growing concern. See *In re New World Pasta Co.*, 2004 W.L. 5651052, at *5 (Bankr. M.D. Pa. July 9, 2004) (where "the continued operation of the Debtors' businesses would not be possible . . . immediate and irreparable harm to the Debtors and their estates would occur."); *Northwest Airlines Corp. v. Ass'n. of Flight Attendants - CWA (In re Northwest*

*Airlines Corp.*), 349 B.R. 338 (S.D.N.Y. 2006) (holding that the loss of ongoing business can constitute irreparable harm), affirmed 483 F.3d 160 (2d. Cir. 2007). The Debtor submits that, for the reasons already set forth herein, the relief requested in this Employee Wage Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate. The relief requested is integral to the Debtor's administrative activities in this Chapter 11 case and is necessary to preserve the value of its business and maximize the value of its estate for the benefit of all stakeholders. Failure to receive such relief within the first twenty-one (21) days in this case would severely disrupt the administration of the Debtor's estate at this critical juncture.

50. The Debtor also requests that the Court waive the stay imposed by Fed. R. Bankr. P. 6004(a), which grants the Court authority to waive the 14-day stay contained in such rule. As described above, the relief that the Debtor seeks in this Employee Wage Motion is necessary for the Debtor to operate without interruption and to preserve value for its estate. Accordingly, the Debtor respectfully requests that the Court waive the 14-day stay imposed, as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

51. Notice of this Employee Wage Motion shall be given to: (i) the Office of the United States Trustee; (ii) the Subchapter V Trustee (when appointed); (iii) the Debtor's 20 largest unsecured creditors (other than Employees); and (iv) all parties who, as of the filing of this Employee Wage Motion, have filed a notice of appearance or request for service of papers. In light of the relief requested herein, Debtor respectfully submits that no further notice is necessary.

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests the entry of an order granting the Motion, granting the relief requested herein and/or such other and further relief as may be just and proper in the premises. Debtor prays for general relief.


THIS, the 25th day of April, 2023.

                Respectfully submitted,

                MISSISSIPPI CENTER FOR ADVANCED MEDICINE, P.C.

                By Its Attorneys,

                LAW OFFICES OF CRAIG M. GENO, PLLC

                By: /s/ Craig M. Geno
                      Craig M. Geno

OF COUNSEL:

Craig M. Geno; MSB No. 4793
LAW OFFICES OF CRAIG M. GENO, PLLC
587 Highland Colony Parkway
Ridgeland, MS 39157
601-427-0048 - Telephone
601-427-0050 - Facsimile
cmgeno@cmgenolaw.com

N:\Firm Data\Users\Bankrupt\MS Center for Advanced Medicine\Pleadings\Revised2 - Em Mot to Pay Prepetition Employee Wages 4-25-23.wpd

## CERTIFICATE OF SERVICE

    I, Craig M. Geno, do hereby certify that I have caused to be served this date, via electronic filing transmission and/or U. S. Mail, postage prepaid, a true and correct copy of the above and foregoing to the following:

    Christopher J. Steiskal, Esq.
    Office of the United States Trustee
    christopher.j.steiskal@usdoj.gov

THIS, the 25th day of April, 2023.

                /s/ Craig M. Geno
                Craig M. Geno

-17-